**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **ERIC JAMES BOGLE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 1:21-CV-00020** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **HILTON HALL, JR., Warden,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Eric James Bogle, an inmate of the Hardeman County Correctional Facility in Whiteville, Tennessee, filed a pro se petition[1] under 28 U.S.C. § 2254 for a writ of habeas corpus challenging his conviction and sentence for rape of a child for which he currently is serving a term of thirty-five years of imprisonment to be served at 100% in the Tennessee Department of Correction. (Doc. No. 1 at 1).

Respondent Hilton Hall, Jr. filed an Answer to the petition (Doc. No. 15) , which is now ripe for review. This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

### I. PROCEDURAL HISTORY

On January 20, 2016, a Marshall County Grand Jury indicted Petitioner with rape of a child. (Doc. No. 14, Attach. 1 at PageID# 72). After a jury trial, Petitioner was convicted of rape

---

[1] Petitioner originally filed this case in the Western District of Tennessee. By Order entered on March 31, 2021, the Honorable S. Thomas Anderson transferred this action to the Middle District of Tennessee. (Doc. No. 6).

Case 1:21-cv-00020   Document 18   Filed 11/16/21   Page 1 of 25 PageID #: 757

of a child. (*Id.* at PageID #146). The trial court sentenced Petitioner to thirty-five years of imprisonment to be served at one hundred percent. (Doc. No. 14, Attach. 2 at PageID# 222).

Petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed his conviction. *See State v. Bogle*, No. M2016-02284-CCA-R3-CD, 2018 WL 3108883 (Tenn. Crim. App. June 25, 2018) (no perm. app. filed). Petitioner did not seek discretionary review by the Tennessee Supreme Court. (*Id.*)

Petitioner subsequently filed a pro se petition for post-conviction relief. (Doc. No. 14, Attach. 10 at PageID# 574). The post-conviction court appointed counsel, who filed an amended petition. (*Id.* at PageID# 582). Following an evidentiary hearing, the post-conviction court denied relief. (*Id.* at PageID# 580). On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals affirmed. *Bogle v. State*, No. M2019-01728-CCA-R3-PC, 2020 WL 6268293, at *1 (Tenn. Crim. App. Oct. 26, 2020) (no perm. app. filed). Petitioner did not seek discretionary review by the Tennessee Supreme Court. (*Id.*)

On March 18, 2021, Petitioner placed the present federal habeas corpus petition into the prison mail system.[2] (Doc. No. 1 at PageID# 6). By Order entered on April 13, 2021, the Court directed Respondent to file an answer, plead, or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 9). Respondent filed an Answer to the petition on July 13, 2021. (Doc. No. 15).

Petitioner asserts a single claim for relief: ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). (Doc. No. 1, Attach. 1 at PageID# 9).

---

[2]     Under the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir. 2002) and *Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Pursuant to this authority, the Court finds that Petitioner filed his petition on March 18, 2021. (Doc. No. 1 at PageID# 6), even though the Clerk of Court received and docketed the petition on March 22, 2021.

2

## II. SUMMARY OF THE EVIDENCE

The Tennessee Court of Criminal Appeals summarized the proof adduced during Petitioner's jury trial as follows:

> At trial, the victim's father testified that he had been married to the victim's mother and that they had two children: the victim and the victim's sister. At some point, the victim's parents divorced. The two children lived with their mother in Jackson but visited their father every summer. In July 2015, the victim's father was remarried and living in West Memphis, Arkansas. About July 13, the victim, who was seven years old, and his sister, who was ten years old, arrived at their father's home for their annual summer visitation. On July 16, the victim's father learned something about the victim from his wife, the victim's stepmother. Based on what his wife told him, the victim's father spoke with the victim. The victim's father said that the victim was scared and reluctant to speak with him at first but that the victim ultimately told him something that made him feel hurt and angry. The victim's father immediately contacted the Arkansas Department of Human Services, which put him in contact with the Department of Human Services in Jackson, Tennessee. On cross-examination, the victim's father testified that when he spoke with the victim on July 16, he asked the victim only one question. He stated that prior to his speaking with the victim, he had not had any custody disputes with the victim's mother and that he currently was not in a custody dispute with her. He said that he was not planning to seek custody of the victim and that he did not have any problem with the victim's mother having custody of the victim.

> The victim testified that he was eight years old. When the victim was seven years old, the Appellant was married to the victim's mother, and the family lived in Jackson. Sometimes, the victim stayed with the Appellant at the Appellant's grandmother's house in Petersburg, Tennessee. The Appellant's mother and grandmother lived in the home, and the victim watched television and jumped on the trampoline during the visits. The victim said that when he took a shower at home in Jackson, he showered by himself. However, when he stayed overnight with the Appellant in Petersburg, the Appellant washed the victim in the shower even though the victim did not need any help. The Appellant had his own bedroom, and the victim slept with the Appellant in the Appellant's bed.

> The victim testified that on one occasion, the Appellant, who was lying on his back on the bed, told the victim to take off his pajamas and get on top of him. The victim did as he was told and sat on the Appellant. The victim said that the Appellant "raised up," put his mouth on the victim's penis, and sucked the victim's penis. Afterward, the Appellant told the victim not to tell anyone. The victim put his pajamas back on and went to sleep.

> On cross-examination, the victim testified that his father was the first person he told about the incident. His father asked how the incident happened but did not ask him

3

any other questions. Defense counsel asked the victim, "[H]ave you ever seen anybody else put their mouth on someone else's penis?" The victim answered, "I seen my dad and my stepmom." Defense counsel then asked if anyone else had ever put his or her mouth on the victim's penis, and the victim said that a male classmate had put his mouth on the victim's penis.

The victim's mother testified that she used to live in Jackson with her children. The victim's mother met the Appellant on a dating website, and they exchanged telephone numbers. The Appellant lived at his grandmother's house in Petersburg, and the victim's mother met him in person for the first time in May 2014. The victim's mother and the Appellant took a trip to Branson, Missouri, and the Appellant met her children when they returned from the trip. The Appellant interacted with the children, and the children trusted him and had a good relationship with him.

The victim's mother testified that she and the Appellant became engaged in December 2014 and that she and the children stayed with the Appellant sometimes at his grandmother's house. The victim's mother and the Appellant were not married, so the victim's mother and the children slept in the guest bedroom while the Appellant slept in his bedroom. Sometimes, though, the victim slept with the Appellant in the Appellant's room. The victim's mother said she never had any concerns about the victim's sleeping with the Appellant.

The victim's mother testified that at some point, the Appellant approached her about him and the victim going on a church trip to an aquarium. The Appellant "thought that it would be good for [the victim] to go," and the victim's mother agreed. The Appellant and the victim went on the trip the first week of June 2015, and they stayed at the Appellant's grandmother's house during the trip. The victim's mother remained in Jackson. When the victim returned home from the trip, he did not say anything bad had happened with the Appellant. The victim's mother married the Appellant on June 27, 2015.

The victim's mother testified that after she married the Appellant, he lived with her and the children in Jackson. In July 2015, the children went to visit their father in Arkansas. On July 16, the victim's mother received a telephone call from the Department of Children's Services. After the call, the victim's mother told the Appellant, "Eric, I just got a phone call saying that there were allegations that my son had been molested by you." She said the Appellant's only response was that "[t]hey will believe a child before they believe an adult." The victim's mother immediately left for Arkansas, her relationship with the Appellant ended, and the Appellant moved back into his grandmother's house. The victim's mother was not allowed to be around her children from July 16 until July 29. In order to get her children back, she had to take certain steps, including obtaining an order of protection against the Appellant.

The victim's mother testified that the victim's father never expressed any concern about her marrying the Appellant. She acknowledged that she was aware the victim may have been sexually abused by a classmate but said that she was unaware the victim may have witnessed sexual activity in his father's home. She said that between the time the victim returned from the church trip and she married the Appellant, she noticed "a couple of changes" in the victim's behavior when he was around the Appellant. However, if she had ever noticed anything concerning, she would not have married the Appellant. At her and the Appellant's wedding, the victim defecated on himself while the family was taking pictures. The victim's mother said the victim's "accident" was not normal. At the time of the trial, she and the Appellant were still married because she could not afford a divorce.

Detective Drew Binkley of the Marshall County Sheriff's Office (MCSO) testified that on October 13, 2015, he and Detective Charles Bass went to a home in Petersburg to try to speak with the Appellant about some allegations against him. They talked with the Appellant in the living room. The detectives read the Appellant's Miranda rights to him, and he signed a waiver of rights form. The Appellant began giving his statement at 4:29 p.m., and he signed his statement at 5:22 p.m. Detective Binkley read the Appellant's statement to the jury as follows:

> [The victim] stayed at my house ... for the first or second week of June for a week. During this week, we would take showers together. He would wash himself and get out and dry off while I washed myself. He never made any comments about my nor his genitalia during these showers.

> One night, we were laying in our bed watching TV and [the victim] said something about his dad and stepmom and what he said he saw. He said he saw her giving oral sex to his dad. Then he talked about a boy putting his mouth on [the victim's] penis. He then stated, or started asking me to do that, but I kept telling him, No, that I was not going to do that. He took his pajama pants off under the covers, then jumped up and put his penis in my mouth. I pushed him off and told him, No. He stated that felt good, Mr. Eric. That was what, that was what that boy did to me in school.

> I didn't tell anyone, because I was afraid of what he would think.

On cross-examination, Detective Binkley testified that in the first part of September 2015, he contacted the Appellant, and the Appellant agreed to come to the police department the next day to speak with the detectives. The next day, though, the Appellant "contacted the Sheriff's Office and stated that he had contacted an attorney." The Appellant provided the attorney's name to the sheriff's office. More than one month later, Detective Binkley spoke with the attorney, and the attorney denied having been contacted by the Appellant. On October 13, Detectives Binkley and Bass went to the Appellant's home to ask him questions. They knocked on the

door, and the Appellant "invited" them inside. Detective Binkley said he did not hear the Appellant say something to the effect of "I don't know if I should let you [in]."

Detective Binkley testified that Detective Bass wrote the Appellant's statement. Detective Binkley explained that Detective Bass would write one or two sentences, that Detective Bass would read the sentences back to the Appellant, and that the Appellant would say, "Yes, that's correct." Detective Binkley acknowledged that Detective Bass did not write down everything the Appellant said. Detective Binkley stated, "[T]here was a few things that wasn't put in there, but it was basically where he would say that nothing ever happened. He would deny every part of it." The officers did not video-record the Appellant's statement.

On redirect examination, Detective Binkley testified that prior to giving his statement, the Appellant advised them that he recently had foot surgery and was taking hydrocodone. The Appellant did not appear to be under the influence of drugs or alcohol. After the Appellant gave his statement, the Appellant read it to himself and signed it. At the conclusion of Detective Binkley's testimony, the State rested its case.

The Appellant recalled the victim's father to the stand. The victim's father testified that he had never had sexual relations with the victim's stepmother in front of the victim and that he had never touched the victim inappropriately. He denied "coach[ing]" the victim.

The jury convicted the Appellant as charged of rape of a child, a Class A felony. After a sentencing hearing, the trial court ordered that he serve thirty-five years in confinement at 100%.

*State v. Bogle*, 2018 WL 3108883, at *1-3. The Court of Criminal Appeals also recounted the facts

surrounding the state court's denial of Petitioner's Motion to Suppress:

Before trial, the Appellant filed a motion to suppress his statement, arguing that he did not give his statement knowingly or intelligently on October 13 because he was on pain medication. At the suppression hearing, Julia Ellen Porter, the Appellant's grandmother, testified for the Appellant that in October 2015, he lived with her in Petersburg. The Appellant had surgery on his ankle and was taking pain medication. On October 13, the police came to Ms. Porter's house. She stated, "They talked to him, and then they come to arrest him, and they took him out on the porch and talked to him.... They took him then, they took him away then."

On cross-examination, Ms. Porter testified that the officers rang the doorbell sometime after lunch and that the Appellant answered the door. The officers were wearing uniforms and came to the house only one time that day. They put handcuffs on the Appellant, and Ms. Porter asked if they were going to arrest him. The officers

said yes. The Appellant's aunt also was present at the home and asked why the police were arresting the Appellant. The officers responded that they had a warrant for the Appellant's arrest. Ms. Porter said that the Appellant's surgery occurred about two months before his arrest and that he was wearing a "boot" on October 13.

The Appellant called Detective Steven Chadwick Bass to the stand. Detective Bass testified that in October 2015, he was a detective with the MCSO. On October 13, Detective Bass and Detective Binkley went to the Appellant's home. They were in uniform, and their guns and badges were visible. They knocked on the door, and the Appellant answered. Detective Bass asked if they could come in, and the Appellant allowed them inside. The Appellant was wearing a foot brace and advised the detectives that he had recently had foot surgery and was taking hydrocodone for pain. Detective Bass filled out a waiver of rights form for the Appellant, and Detective Bass acknowledged that he wrote "hydrocortisone" instead of "hydrocodone" on the form. He said, "That was a mistake on my part." The Appellant told the detectives that he had not taken the medication since "[l]ast night."

Detective Bass testified that he read the Appellant's rights to the Appellant and that he explained to the Appellant "exactly what they meant." He and Detective Binkley then took the Appellant's statement. Detective Bass acknowledged that the Appellant was free to leave but that he never asked the Appellant if the Appellant wanted them to leave. Detective Bass said that "[i]f he [had] wanted us to leave, we would have left" and that "I made sure he understood what his rights were and that he didn't have to talk to us if he didn't want to."

On cross-examination, Detective Bass testified that on September 8, 2015, he and Detective Binkley went to the Appellant's residence and "made contact with him at the front door." Detective Bass "requested" that the Appellant come to the sheriff's office the next day to give a statement, and the Appellant "was agreeable to that, and he said he would be there." The Appellant was not in custody, they did not arrest him, and they left. The next day, the Appellant contacted Detective Bass by telephone and said he was not coming to the sheriff's office because he wanted to talk with an attorney. The detectives never heard from the Appellant or an attorney, so they returned to his house on October 13.

Detective Bass testified that he did not remember if the Appellant or the Appellant's mother answered the door. Detective Bass introduced himself and asked if the Appellant would like to talk with them. The Appellant responded that "he wasn't sure but to come in and sit down and we would talk about it." The detectives went into the living room. The Appellant and Detective Bass sat down, and Detective Binkley leaned against a wall. Detective Bass never told the Appellant that he was under arrest. Detective Bass read Miranda rights and the waiver of rights form to the Appellant. Detective Bass explained the waiver form, handed the form to the Appellant, and asked the Appellant to read aloud any line he wanted to read. The

7

Appellant read aloud his right to remain silent. The Appellant said he would talk to Detective Bass, and Detective Bass told the Appellant that the Appellant would have to sign the form. The Appellant signed the form, and Detective Bass filled in the date, October 13, and the time, 4:29 p.m. Both detectives also signed the form.

Detective Bass testified that the Appellant said he could read and write and that he had "[s]ome college" education. The Appellant stated that he was under a doctor's care for foot surgery and was taking hydrocodone but that he had not taken the medicine since the previous night. Detective Bass estimated that the Appellant had not taken the medication for at least twelve hours, and the Appellant did not appear to be under the influence of any substance. The Appellant's grandmother and another woman were present. Detective Bass thought the woman was the Appellant's mother, but he acknowledged that she could have been the Appellant's aunt.

Detective Bass testified that he did not consider the Appellant to be in custody and that he would have left if the Appellant had told him to do so. After the Appellant gave his statement, he reviewed it. He signed and dated the statement at 5:22 p.m. Detective Bass thanked the Appellant for his time, and he and Detective Binkley left and returned to the sheriff's office. Detective Bass obtained a warrant for the Appellant's arrest, and he and a deputy returned to the Appellant's home. The Appellant was outside, and the officers handcuffed him and took him into custody. Detective Bass estimated that one and one-half to two hours had elapsed between the time he left after obtaining the Appellant's statement and his return to arrest the Appellant.

On redirect examination, Detective Bass denied speaking with the Appellant by telephone on September 8. He acknowledged that on September 9, the Appellant told him that the Appellant needed an attorney. Detective Bass did not speak with the Appellant again until October 13. On that day, Detective Bass went to the Appellant's home to see if the Appellant would talk with him and asked the Appellant to waive his right to counsel. He acknowledged that without the Appellant's statement, he would not have obtained an arrest warrant for the Appellant on October 13.

Detective Binkley testified for the State that on September 8, 2015, he and Detective Bass went to the Appellant's home. Detective Bass knocked on the door and asked if the Appellant wanted to come to the sheriff's office for an interview. The Appellant said he would, and the detectives left. The Appellant was supposed to come to the sheriff's office the next day.

Detective Binkley testified that on October 13, they returned to the Appellant's house and knocked on the door. Detective Bass spoke with the Appellant. The Appellant said he would talk with them and invited them in the house. They went into the living room, and the Appellant and Detective Bass sat down while Detective Binkley stood by the door. Detective Bass went over the Appellant's

rights with the Appellant and explained them to the Appellant, and the Appellant waived his rights. Detective Bass talked with the Appellant about the allegations, and the Appellant gave a statement. The detectives left, and Detective Binkley did not return with Detective Bass to arrest the Appellant.

On cross-examination, Detective Binkley testified that he did not have any contact with the Appellant between September 9 and October 13. Although the Appellant never contacted Detective Binkley during that time, he may have contacted Detective Bass.

At the conclusion of the hearing, defense counsel argued that the Appellant's October 13 statement was involuntary due to "a very strong opiate he took the night before." Defense counsel also argued that based on Detective Bass's surprising cross-examination testimony, "Detective Bass resumed the interrogation after the [Appellant] had invoked his right to counsel" on September 9. Defense counsel requested that he be allowed to amend his motion to suppress to include the new issue. The trial court immediately ruled that the evidence did not show the Appellant was under the influence of pain medication when he gave his statement and gave counsel one week to submit a brief on whether the Appellant requested an attorney prior to a custodial interrogation. Subsequently, defense counsel filed a brief in which he argued that the Petitioner invoked his Fifth Amendment right to counsel on September 9 and that the detectives violated that right by questioning him without counsel present on October 13. Defense counsel asserted that the detectives conducted a custodial interrogation on October 13 because the officers were in uniform with their badges and guns visible and because they read the Appellant his Miranda rights. In a written order, the trial court ruled that the interrogation on October 13 was noncustodial and denied the Appellant's motion to suppress.

*State v. Bogle*, 2018 WL 3108883, at *3-5

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

On October 5, 2018, the Petitioner filed a pro se letter with the trial court clerk seeking relief from his conviction. On November 19, 2018, the Petitioner filed a timely amended pro se petition for post-conviction relief upon the order of the post-conviction court, alleging ineffective assistance of counsel. The Petitioner was appointed counsel, who filed an amended petition for post-conviction relief on May 20, 2019, alleging, inter alia, the same claims raised in the appeal. The post-conviction court held a hearing on the petition on August 23, 2019.

The Petitioner testified that trial counsel was appointed to represent him after he was "dropped" by the Public Defender's Office, and he was not in custody at that time. He believed that he met with trial counsel three times at the Marshall County

jail and that these meetings lasted about twenty-five minutes. He said that trial counsel discussed discovery and a trial strategy with him during these meetings. The Petitioner said that his family gave trial counsel photographs of himself, the victim, and the victim's mother, who was his wife, at their wedding. He said these photographs would show "how [the victim] loved [him] and that [the victim] was happy before. [The victim] was happy before [the Petitioner] got charged with [his] charge." He believed these photographs would have shown proof of his relationship with the victim and that trial counsel should have shown these to the jury. He believed that trial counsel failed to establish his relationship with the victim at trial.

The Petitioner said he did not believe that trial counsel effectively cross-examined Detective Bass at the hearing on his motion to suppress, and he wanted him to be called at his trial. The Petitioner stated that trial counsel knew that he was on prescribed pain medication at the time of his interview with Detectives Bass and Binkley, and he told trial counsel about the effects that this medication had on him at that time. He said that trial counsel "mentioned" his intoxication level at trial, and he did not ask trial counsel to put on expert proof of this, although he believed it would have helped his case.

On cross-examination, the Petitioner agreed that trial counsel filed a motion to suppress his statement to law enforcement, and he was aware that this motion was overruled by the trial court. He was not aware that this Court affirmed the trial court's determination on direct appeal. The Petitioner said that the victim defecated on himself at his wedding because he had been in trouble earlier that day. He agreed that testimony about the victim's defecating on himself came out at trial and that the victim's mother said this was not normal behavior, but the Petitioner insisted that this was normal and "[the victim] was having accidents before [they] met." The Petitioner said that trial counsel did not cross-examine any witnesses at his trial about his level of intoxication, although he agreed that trial counsel cross-examined Detective Bass about this issue at the suppression hearing. He said that trial counsel called the Petitioner's grandmother at the suppression hearing, but she was unable to testify about his level of intoxication at that time.

On redirect examination, the Petitioner said that, because his grandmother could not testify as to his intoxication level, he wanted trial counsel to call an expert witness to testify about this at trial. He said he also wanted trial counsel to question the victim's mother about whether it was a normal occurrence for the victim to defecate on himself. On recross examination, the Petitioner agreed that trial counsel asked the following question: "So the accident, for all we know, could have been the fact that it was a long day at the wedding, right?"

Trial counsel testified that he was a self-employed attorney when he was appointed to represent the Petitioner, which was shortly after trial counsel moved to begin practicing law in Tennessee. He remembered reviewing the Petitioner's case file when he received the case from the Public Defender's Office, but he could not remember exactly what discovery he went over with the Petitioner. Trial counsel

was appointed to represent the Petitioner when he was brought to court on a bond revocation, and the Public Defender's Office was allowed to withdraw from the case due to a conflict. Trial counsel said that it was his "pattern of policy and practice when [he was] meeting with clients before trial to go over strategy with them," but he could not say with certainty what exactly he went over with the Petitioner prior to his trial.

Trial counsel stated that he received photographs of the Petitioner and the victim, and he believed it was important to establish a relationship between them. He said he asked the victim's mother about the "circumstances surrounding [the] photographs" because he was going to "lay a foundation to having them admitted[;]" however, the victim's mother "surprised [him] by saying that after those photos were taken, even though they looked very happy, [the victim] had [an] ... accident." Therefore, "based on that representation, [trial counsel] did not see any utility in going down that line of question[ing], and therefore, bringing the pictures in." Trial counsel believed that the Petitioner and the victim were smiling and standing close together and that this depicted a relationship between them. He said it "wouldn't have hurt" to establish this relationship, and he agreed that the photographs could have done this "subject ... to the mitigating factors that [he] mentioned." Trial counsel deferred to the trial transcript to show if he attempted to establish this relationship in any other way at trial.

Trial counsel believed that he cross-examined Detective Bass about the Petitioner's intoxication at the suppression hearing. He did not call Detective Bass at trial because he believed that the State would call him as a witness, but he stated that, in retrospect, he was glad that he did not do so because the State could have asked him questions on cross-examination to reinforce the State's case. Trial counsel could not recall "for absolute certain" whether he discussed the Petitioner's intoxication level with him, and he could not recall the specifics of any conversations they may have had on the subject. He said it "didn't cross [his] mind that it would be necessary" to call an expert witness to testify about the "effects of hydrocodone on someone's mental state[.]" He did not believe that this testimony would have been favorable because of the amount of evidence that corroborated the Petitioner's confession. He agreed that it would have been favorable to exclude the confession but that his trial strategy changed when the motion to suppress the confession was denied. He said he did not attempt to discredit the confession because he "would have to dismiss the veracity of the confession itself and prove through some extraneous evidence that perhaps the [victim] was lying and making this all up." Trial counsel could not remember any testimony coming out at trial that the victim had been abused by someone else.

On cross-examination, trial counsel testified that he became licensed in Tennessee in 2009 and had practiced primarily criminal defense work since then, and he also practiced criminal law before moving to Tennessee. The Petitioner's trial was trial counsel's first criminal jury trial in Tennessee. Trial counsel believed he met with the Petitioner more than three times, and he believed he went over discovery with

the Petitioner. He received the photographs of the victim and the Petitioner from the Petitioner's family, and he said he gathered information about the Petitioner's relationship with the victim and the Petitioner's intoxication level prior to trial. Trial counsel said he went to Walgreens to get the Petitioner's prescriptions to "study" them, and he spoke to the Petitioner about his medication. Trial counsel also filed a motion to suppress the Petitioner's statement to Detectives Bass and Binkley due to the Petitioner's intoxication, and he believed that he cross-examined the witnesses at that hearing about this. He said he "poke[d] holes" in witnesses' testimony about whether or not the Petitioner was intoxicated at the suppression hearing and at trial.

Trial counsel recalled asking the victim's mother whether she would have married the Petitioner if she had "all of these doubts about [him], and the victim's mother responded that she did not notice any problems between the Petitioner and the victim prior to their marriage." Trial counsel said he received an unfavorable response from the victim's mother, so he decided not to introduce the photographs of the Petitioner and the victim because he did not want to "reiterate [the evidence] over and over again." Trial counsel believed that calling Detective Bass could lead to the State's highlighting the Petitioner's statement "over and over, again." Trial counsel believed the evidence showed that the Petitioner took hydrocodone the night before his interview with Detectives Bass and Binkley. Trial counsel believed that he had no reason to call an expert witness to testify about the Petitioner's level of intoxication, and he believed that this testimony could have brought even more attention to the Petitioner's confession. Trial counsel agreed that he cross-examined Detective Binkley about the Petitioner's intoxication level. Trial counsel said he advanced the theory to the jury that the victim had seen sexual behavior from someone other than the Petitioner by cross-examining the victim on this issue. He also elicited from the victim that one of his classmates had performed sexual acts on him before. Trial counsel noted that this Court held on direct appeal that the evidence was sufficient to sustain the Petitioner's conviction, even without his confession. On August 27, 2019, the post-conviction court denied relief by written order. This timely appeal followed.

*Bogle v. State,* 2020 WL 6268293, at *3-4.

### III. STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal

system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

"Clearly established Federal law" is the law in effect at the time of the state court's adjudication. *Greene v. Fisher*, 565 U.S. 34, 38-40 (2011); *see also Cullen v. Pinholster*, 53 U.S. 170, 182 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Additionally, "clearly established Federal law" includes only the holdings, as opposed to the dicta, of United States Supreme Court decisions. *White v. Woodall*, 572, U.S. 415, 419 (2014).

A state court's decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Metrish v. Lancaster*, 569 U.S 351, 357 n.2 (2013). Where no United States Supreme Court case confronts the specific question presented by a state-court case, the state court's decision cannot be "contrary

to" a holding from the United States Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (citing *Lopez v. Smith*, 574 U.S. 1, 6 (2014)).

A state court's decision involves an "unreasonable application" of federal law if "the state-court decision identifies the correct governing legal principle in existence at the time," but "the decision unreasonably applies that principle to the facts of the prisoner's case." *Pinholster*, 563 U.S. at 182 (internal quotation marks and citations omitted). In order for a state-court decision to be an unreasonable application of Supreme Court case law, the ruling must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, __ U.S. __, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods*, 575 U.S. 312, 316) (internal quotation marks omitted); *Williams*, 529 U.S. 362, 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."). When no Supreme Court precedent "clearly forecloses" a state-court decision, it is not an unreasonable application of federal law as decided by the Supreme Court. *Woods v. Etherton*, 578 U.S. 113, __, 136 S. Ct. 1149, 1152 (2016).

Habeas corpus relief is also available when the state-court adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1); *see also Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (state-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." ) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)

14

(internal quotation marks omitted)). As the United States Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a  substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. 362, 410).  Review under Section 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. 170, 182.

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim).  This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").  In Tennessee, "when the claim has been presented to the Court of Criminal Appeals of the [Tennessee] Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies available for that claim." Tenn. R. Sup. Ct. 39; *see Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003).

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. 722, 754). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id*. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id*. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

16

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

In *Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058, 2062 (2017), the Supreme Court reiterated that *Martinez*'s "narrow exception to the *Coleman* general rule" does not extend beyond claims of ineffective assistance of trial counsel. In *Davila*, the Court declined to extend *Martinez* to procedurally defaulted claims of ineffective assistance of appellate counsel. *Id*. at 2063. As the Court aptly noted, "[a]pplying *Martinez*'s highly circumscribed, equitable exception to new

17

categories of procedurally defaulted claims would thus do precisely what this Court disclaimed in *Martinez*: Replace the rule of *Coleman* with the exception of *Martinez*." *Id*. at 2066.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

## IV.  ANALYSIS

 With these principles in mind, the Court will turn to the examination of the sole claim raised in Bogle's petition for habeas relief: that trial counsel was ineffective for failing to hire a medical expert.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.   Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). "Surmounting *Strickland*'s high bar is never an easy task."

18

*Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The legal standard articulated in *Strickland* is "highly demanding." *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

In assessing performance, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Strickland*, 466 U.S. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must meet both prongs of the test, but courts are not required to conduct an analysis under both; thus, a court need not address the question of competence if it is easier to dispose of the claim due to the lack of prejudice. *Id*. at 697.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining

19

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

Petitioner Bogle alleges that trial counsel was constitutionally ineffective. As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (internal quotation marks and citation omitted).

Here, Petitioner alleges that trial counsel was ineffective for failing to obtain a medical expert to testify regarding Petitioner's alleged intoxication at the time Petitioner gave his confession. Specifically, Petitioner asserts that he was prejudiced when trial counsel failed "to retain an expert medical witness prior to trial, to testify to the effects of the drug Hydrocodone on

the Petitioner's mental processes, in regard to whether or not his interview and confession to police

. . . was freely, intelligently, and voluntarily given." (Doc. No. 1 at PageID# 15).

Petitioner raised this ineffective assistance of counsel claim in his post-conviction petition, and the post-conviction court denied relief. The court found:

> [Petitioner] contends that trial counsel was ineffective when he did not call Detective Chad Bass as a witness at trial. At the hearing, [trial counsel] testified that he made a tactical decision not to call Bass during the trial. [Trial counsel] did call Bass at the suppression hearing and it was determined by [trial counsel] that his testimony would not be helpful to the [Petitioner] at trial, especially since his testimony was consistent with that of Detective Binkley. By calling him as a witness during the Defense proof, [trial counsel] testified that he was concerned that this would "open the door" for the State to continue to highlight the [Petitioner's] written statement previously admitted by the State. The Court has reviewed the transcript of the suppression hearing and has determined that [trial counsel's] tactical decision not to call Bass was reasonable. Calling Detective Bass on direct would have only allowed the state to further accentuate the inculpatory statement of the [Petitioner]. This issue is without merit.
>
> As testified at the hearing, [trial counsel] did, in fact, investigate the Petitioner's prescribed medication(s) and the effects that the medication(s) may have had on the Petitioner during his interview with law enforcement. [Trial counsel] testified that he went to the pharmacy and obtained a copy of the prescription. Further, [trial counsel] interviewed the individuals (Bass, Binkley, and Porter) that were at the residence at the time of the interview with Bass and Binkley, and further determined that no witness could/would testify that the [Petitioner] was under the influence at the time the statement was made. Conversely, at the suppression hearing, the [Petitioner's] grandmother ("Porter") testified that she did not know the last time before the interview with Bass and Binkley that [Petitioner] had taken his pain medication. Further, two well-trained law enforcement officers testified that in their opinion, as trained law enforcement officers, the Petitioner was not under the influence at the time of the statement. [Trial counsel] attempted to draw doubt to the [Petitioner's] mental impairment at the trial [ ]; however, the Jury simply did not sustain the argument.
>
> Furthermore, at stated by the Tennessee Court of Criminal Appeals, the evidence is sufficient to support the [Petitioner's] conviction, with or without his statement to the detectives. Even if the legal representation fell below an objective standard of reasonableness and whether the services were outside the range of competence demanded attorneys in criminal cases by not retaining an expert to testify as to effect of the hydrocodone taken by the [Petitioner] not less than 16 hours before the interview with the detectives, the [Petitioner] has failed to show that it is reasonably probable that but for counsel's errors, the results would have been different.

21

Conversely, this Court holds that the result would have been the same with or without the statement. This issue, together with sub-parts, is without merit.

*Bogle,* 2020 WL 6268293, at *7.

In reviewing the post-conviction court's denial of Petitioner's ineffective assistance claim based on counsel's failure to call an expert to testify about the effects of Petitioner's prescribed medication on his mental state, the Tennessee Court of Criminal Appeals began by setting forth the correct legal standard for evaluating claims of ineffective assistance of counsel. *See id.* at *5 (quoting *Strickland*, 466 U.S. 668, 687). Applying *Strickland* and its progeny to the facts of Petitioner's case, the Tennessee Court of Criminal Appeals concluded that "[t]he evidence does not preponderate against the determination of the post-conviction court on these sub-issues related to trial counsel's strategic decision not to highlight the Petitioner's intoxication at the time of his interview with Detectives Bass and Binkley." *Id*. at *8. In particular, the state appellate court found that

> [t]rial counsel testified that he cross-examined Detective Bass at the suppression hearing about the Petitioner's intoxication level, and he did not call Detective Bass at trial because he did not want to bring attention to the Petitioner's confession. Trial counsel did not believe that it would be necessary to call an expert witness to testify as to the effects of hydrocodone on an individual's mental state, and he cross-examined Detective Binkley on the Petitioner's intoxication level at that time. Trial counsel believed that, once the motion to suppress was denied by the trial court, he should change his trial strategy so as not to highlight the confession. He also stated that, even without the confession, the evidence presented against the Petitioner at trial was strong. These are all reasonable strategic decisions made by trial counsel. Again, the Petitioner failed to present any witnesses, either expert or lay, about the effects that the Petitioner's prescribed medication could have had on his mental state at that time. He also failed to present Detective Bass at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As such, the Petitioner is also not entitled to relief on this issue.

*Id*.

The state court's decision was not unreasonable or contrary to law. Trial counsel filed a motion to suppress Petitioner's statement to law enforcement, a fact that Petitioner acknowledged

during his post-conviction hearing. During that hearing, trial counsel testified that he had investigated Petitioner's prescribed medication and the effects it may have had on Petitioner during his interview with law enforcement. Counsel had interviewed the three individuals who were present at the time of the interview and determined that no witness could or would testify that Petitioner was under the influence at the time the statement was made. Even though Petitioner's grandmother testified during Petitioner's suppression hearing, she did not know the last time before the interview with Bass and Binkley that Petitioner had taken his prescription pain medication; her testimony, therefore, did not support Petitioner's motion to suppress. Counsel cross-examined Binkley during the suppression hearing about Petitioner's intoxication level at the time of the interview, attempting to cast doubt on Petitioner's mental status at the time of his confession. But counsel explained that, once the trial court denied Petitioner's motion to suppress, counsel made a strategic decision to change his trial strategy so as not to focus on the hydrocodone issue. He believed that focusing on Petitioner's alleged intoxication would have brought attention to Petitioner's confession, "opening the door" to more incriminating testimony against Petitioner. Counsel also testified that, even without the confession, the evidence presented at trial against Petitioner was strong.

Based on these facts, the state court was not unreasonable in determining that counsel made a reasonable and informed strategic decision not to retain an expert to testify about the effect of hydrocodone taken by Petitioner approximately sixteen hours before the interview with law enforcement. It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion." *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at that time." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

Even if the Court assumes for the purposes of this analysis that counsel's performance was deficient, Petitioner has failed to demonstrate that the state court unreasonably rejected his prejudice argument. At his post-conviction hearing, Petitioner failed to present any witnesses about the effects that his prescribed medication could have had on his mental state at the time of the interview. Furthermore, the record shows that the evidence was sufficient to support Petitioner's conviction, with or without his statements to the detectives. Therefore, even if counsel's representation fell below an objective standard of reasonableness, Petitioner has failed to show that it is reasonably probable that, but for counsel's errors, the results of his trial would have been different.

 Consequently, the Court finds that Petitioner has not shown that he is entitled to relief on his sole claim of ineffective assistance of counsel because the state court's determination was not contrary to *Strickland*. Neither was the state court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted. This claim is without merit and will be dismissed.

## V.  CONCLUSION

For the reasons set forth herein, the petition filed by Eric Bogle seeking relief under 28 U.S.C § 2254 will be denied, and this action will be dismissed with prejudice.

24

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with this Court's resolution of Petitioner's claim, the Court will deny a COA.

An appropriate Order will be entered.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE